Ms. Raulston, would you call our first case, please? 17-2041 Park, Utah v. Gannett Co. Inc. All right, will counsel for the parties please step up, identify yourselves, and tell us who you represent. Good morning, Your Honors. My name is Jeffrey Fett. I represent the appellant's, objective appellant, Gary Stewart. All right. Good morning, Your Honor. My name is Alexander Kieske. I represent plaintiff's appellee's last process appellant, Ramona Clark. Good morning, Your Honor. My name is Matthew Fields. I'm the law firm's director of delivery. I represent the defendant's appellate, Gannett Co. All right. Good morning, Your Honor. I'm Dr. D. O. E. P. I. I'm the law firm's representative. Thank you. Good morning, Your Honor. My name is Robert Maynard. I'm the attorney for Christopher Gannett. Okay. Now, have you discussed or given any thought to how you want to proceed? Yeah, Your Honor, with the two minutes, 15 minutes, I can talk extremely quickly. So for the three on this side? No, three on this side. Three on this side. Three minutes total? Yeah, if you want to give us more, fine. Well, we do have another case this morning, but we've allotted a little extra time. We pretty much agreed that it's going to be about divided equally between the three of us. Okay. And? We've also talked over that 15 minutes is fine with us. Okay. Okay. And I will tell you that the three of us are very familiar with the briefs. We've read everything. We're familiar with the record. And so when you argue, if you would keep that in mind and stick to the issues, we would appreciate it. And so, Mr. Thot, you're going to go first? Yes, ma'am. All right. Counsel, if you would please have a seat. I will tell you that the microphone in front of you is not for amplification. It's simply for recording. So if you would keep your voice up. You won't have a problem hearing this. Okay. Great. Thank you. One question. You hear everything optimally, technically, but maybe it doesn't make sense for me to come up with questions. I think that's probably true. Well, you know. Me, then him, then them? No. Well. I need to do this. I think that. I think it would be out of progress if it doesn't happen later. I want to go first and then we follow up. Okay. All right. We'll do that. Thank you. We'll do that. Just to make sure. Okay. May it please the Court. My name is Jeffrey Kottner. I represent Gary Stewart, who is an objector appellant in this case. In our appeal, there's two major issues. The first of which is the 237 notice which compelled Mr. Stewart to appear at a motion for sanctions that at the time it was being heard in July of 2017 was just being brought against myself. Mr. Piolla is going to. When there's a case pending and somebody is a party, and I know you're contending that Mr. Stewart is not exactly a party, it's no defense to an order of court to say, well, I made my own determination that the hearing didn't pertain to me personally, so I'm not going to show up. Whether or not if the Court did not fail the power to compel him under Supreme Court Rule 237, he decided he was not going to appear. So it's a one-way street for Mr. Stewart to come into the circuit court and say, grant me relief. I'm an objector. Grant me relief that you can only do if you have jurisdiction over me. And then once that's resolved, says I'm not subject to your jurisdiction. He's out of the case. But he is in the case. No, he's not. Wait a minute. Let's go through it. Let's go through it. Yes. Does he have an appearance on file? He did. Through you? He did. He appeared in the case. He did what he did? Absolutely. What else did he do? He appeared, well, he appeared as an objector. Is that correct? Is that correct? Yes. Okay. And he appeared and he filed an appearance as a DTF. Yes. Okay. Now, could the plaintiffs have asked for discovery from Mr. Stewart? When? At any time. In November? May I respond? In November of 2016? Yes. Okay. So, I'm asking you a question. That's fine. I'm not asking you a question. I'm asking you to respond. Well, I'm going to respond. Okay. He said yes. Well, I said in November, yes. It doesn't matter. He said yes. Okay. Therefore, he's a partner because he has to respond to request for discovery. He has an appearance on file in Illinois. If they had wanted, they probably could have taken a deposition, too. Yes. That happens in these cases, as you know. Yes. So, for all purposes, he is a party now that he has appeared through you. I respectfully disagree. Can I explain that? Yes. Okay. This is no different than any other multi-party litigation. Assume for a second we've got a plaintiff, defendant A, and a defendant B. The case begins. Somewhere along the line, defendant B is removed from litigation either by settlement, by being dismissed, or some other court action. If you believe defendant B is in a party for a subsequent trial two years later, I don't think so. In my analogy, you're saying I don't think so. Well, I don't at all. You really don't at all. Okay. So there's no law. No. I'm absolutely not scaring you in which you have no basis. What I'm doing is a practical matter. It's what I just outlined happening. Defendant B, who was dismissed out of the case two years earlier, will need to be subpoenaed for trial. He would not have to be subject to a 237 notice. Unfortunately, your analogy doesn't apply. It does. With all due respect, it does. Okay. Unfortunately, this is a class act. It is. And from an absent testimony, he became a party by intervening as an objector. And his role in the lawsuit ended on November 14th of 2016. His objection was overruled. Done. He did not have a dog in this fight on July 20th of 2017. Could he have appealed at that time? Could he have appealed? Could you have appealed at that time regarding an analogous objection? Was the case over? Right there on the 17th, I could have. Yes. I could have. I did. Yeah. I did. And then they filed motion for sanctions against me. Right. And against Mr. Baker so that I'm not against Mr. Stewart. Okay. It's a case not over, right? You're absolutely right. Okay. And the issue with regard to you has to do with your interaction with your alleged client. He's not an alleged client, Judge. He's my client. He's your client. Yes. Do you have any other clients in this case? No. Okay. And who paid your fee in this case? That's not an issue here. Who paid your fee in this case? Mr. Stewart. He paid the $5,000 to film at the record show. Mr. Vaness fronted Mr. Stewart's fee. Oh, Mr. Stewart is liable for the fee? Yes. Why does it say that? The contract is not in the record. Oh, it was in the contract? With Mr. Stewart? Absolutely. I didn't give him the money. You didn't? Yes. It's not in the record? No. Then he has to be a producer. Why would he not be a producer? No, it's in the record. I thought there was testimony by you in it. I don't have any agreement with Mr. Stewart. I don't have any agreement with Mr. Vaness. I do not believe that's what the record says. But I did find an engagement letter that Mr. Stewart signed. You did find it? Yes. And I have one before this court as well. Before this court? Yes. I'm not as concerned about what you have before this court as what your testimony was. I don't care. Are you saying your testimony... Give me a second. On this issue, you just reminded me. Oh. I sent an engagement letter out. When did you send the engagement letter? Back in November. It's not in the record. You testified... I have an agreement, which I might finish because you're challenging my testimony. My testimony was I did not have a written engagement letter with Mr. Stewart. That is correct. I sent one out. I did not get it back. Oh. Oh. So you don't have a written agreement. I do not. Okay. Let's try it. Will you please try it? Yes. Stick to the record. I will stick to the record. If you get a call, tell me so. Okay. Take some time rather than... Yes. Say something that's incorrect. I don't want to do that. Okay.  You have no written or oral agreement with Mr. Stewart. Well, let me be clear. Anytime, except you say now, which is not in the record, so it's irrelevant for my purposes with regard to the appeal. I'm talking about at the time in the record, this appeal. Yes. You testified you didn't have such a piece of paper. I testified I did not have a piece of paper. Correct. Okay. All right?  All right. Back in November, when he authorized me to go ahead on his behalf. Right. Exactly. He had no written agreement. Correct. In Illinois, well, honestly, Judge, to be fair, I sent it out. I did not get it back. What? And you went ahead. I went ahead. And in Illinois, can you obtain a contingent fee without a written agreement? No. So you're not asking for a contingent fee. You weren't going to get a contingent fee. Correct. And you were paid $5,000 by whom? By Mr. Vance. That's who you testified to. Yes. And you testified that you might get some more money. Possible. Contingent fees? No. But you don't have any written agreement with him. Now I do. Now I do. Yes. After the fact. Yes. In Illinois? In Illinois. In Illinois. Is it a little late? I got a written agreement when it came time to file an appeal. Okay. With regard to your appeal, what did you appeal? What did I appeal? What orders did you appeal? I am appealing the order holding Mr. Stewart in contempt. I'm appealing the November order approving the fees. And the order holding Mr. Stewart in contempt was dated what? I believe July 20th, 2017. Okay. Let me read the order of July 24th, which states, It is hereby entered that the order of contempt dated July 20th, 2017 is withdrawn, and the following order is entered. Yes, that's the order we appealed from. No, it isn't. Well, you told me you appealed in the July 20th. I spoke with the date, Judge, but it wasn't from that date. I'm going to get my notices of this. And so the order was revised. It was initially entered on July 20th, and it was revised on July 24th. No, it wasn't revised. It was withdrawn. Is there a difference between revised and withdrawn? What date of the order did you have? I'm looking at the notice of appeal, so don't tell me it's dated July 24th. I misspoke on July 24th. It's signed by Judge Morrison on July 24th, 2017. What? It's signed by Judge Morrison on July 24th, 2017. Morrison? Judge Morrison? Yes, Judge Pamela McClain-Langston. That's not on me. No, it's not. Did you say in the notice of appeal, a copy of the July 20, 2017 order is attached as Exhibit 2? Yes. And you're appealing, you say, from the July 24th, correct? That was the initial filing of contempt, and then there was a subsequent order on July 24th. Which you did not appeal from? I believe we did. Why do you believe you didn't? I am looking at the notice of appeal that's attached to our brief and the appendix, and attached to that is the July 24, 2017 order. It is? What's the name? C-1547. C-1547? Yes. Matt? We're accusing this case of this, Matt. If nothing serves me right. Hold on, hold on. You've got to be very accurate here. Okay. I'm looking at C-1547. Yes, okay? That is called Exhibit A-3. Yes. And there's an A-2, 78. And before that is a November 14th order. And before that, Table of Appendix, Objection, Judgment Order of November. I see what you're saying there. I see what you're saying. What am I saying? You're saying that the order that we appealed from was on July 20, 2017. That was the initial order that she held Mr. Stewart in contempt. That was also the order that denied sanctions against me. It was entered on the same day. The initial typewritten order that Judge Myerson came out with had a discrepancy. I think it said, and bear with me, I'm not positive on this, but it's in the transcript. It said indirect criminal contempt. And then on July 24th, she said, no, no, no, I'm going to revise that to make it direct criminal contempt. And that order was, in fact, entered on July 24th, 2017. And I acknowledge that my notice of appeal does not say the July 24th order. So you appealed from a withdrawing order? Yes. So why do you have jurisdiction over your? Honestly, I knew that order. That has never been raised before about the July 24th order. But we can make your statement. Of course you can. I acknowledge that. Okay. So I want to give you an opportunity to make any argument you wish. Well, what do you got to that error? Okay. Well, you did not attach. I just want to make it clear in the record that what you're saying is that in your notice of appeal, you did not attach a copy of the July 24th, 2017 letter. You're probably right. We also know, however, Mr. Stewart did appeal for all previous interlocutory orders that ostensibly were made final and appealable by the July 20th, 2017. Previous is that matter? I'm just saying. So the order that's can be argued, and I will argue, that we're appealing from the order of the judge that said you must appeal for the 237 sanctions. I think it's fair to ask jurisdiction to review that because that occurred on June 30th of 2017. We're also appealing from the order that denies the fees. But the actual order, the previous order really was superseded. Was it not? Yeah. July 24th. Yeah. So the prior order was the 20th order. I understand. I understand what you're saying. Yeah, of course. I can't dispute that. Okay. I cannot dispute that. Okay. If this court does get to the fees, I think that the court did err in awarding a $5.3 million fee in this case. Had this case been sent down and filed in the United States District Court where many class actions are filed, the fee award would have been approximately $2 million less than it was awarded by the circuit court. You base that on the chart that analyzed the average fee awards in TCPA cases. There's two things in TCPA cases. That chart is contained in the Capital One case, the 800F sub-third. And that case clearly shows that the average TCPA award is 23.7% of the fees or 25% depending if you're using the mean or the median. That amounts to about a $2 million sling that this class should have gotten that they also got. There's another Seventh Circuit opinion in, I think it's called Synergy 2, which the Seventh Circuit approved of a formula where the class council would get 30% of the first $10 million of any settlement and 25% of that over the $10 million. You're making these arguments to us. It's interesting to note that according to the record, there were conversations that appeared to be, there was a mediation apparently, not with you, with Mr. Bender, in which there was a request for a period fee to drop the appeal. That's in the record, right? I guess so. It's in the record. I was not part of that. I guess. I'm not saying you were. Okay. That's in the record. And at the hearing on the final approval, what did you say? At that hearing, I said I stand on average. You made no argument at all. There's a reason for that, if I might tell the court. At that point, the minute I filed an appeal in this case, or the minute I appeared in this case and filed an objection, the first thing that happened was I was threatened by class counsel that they were going to sue me. The second thing that happened is I appeared in court. And on the way out, again, class counsel got me in the hallway, and this is in the record, and said, I'm going to sue you. This is not going to end well for you at all. So rather than give them any more ammunition for some frivolous lawsuit that they're going to come at me with, I looked at the briefs, and I do this a lot. It's not the first case I've ever said, Your Honor, unless you have any questions, I stand on our briefs. And that's what I did. I don't have a problem with that. And I don't think it's really wrong. I don't think it's sanctionable. You don't think you had an obligation on behalf of the objector to say something? You're saying because of your own personal situation. It is. It is. He was threatened as well. And he was made a defendant in a legal case as well. Well, that occurred after the hearing. No, the threat did. And you reported the threat to the court before? No. No. So you decided that you're just fastidious. I stood on my briefs. And I stand by that decision. If the court has any further comments, I will yield. No questions. Thank you, Mr. Thup. Mr. Chesky? No. Thank you. Okay. On behalf of Gannett. Thank you, Your Honor. I intend to be very brief. Gannett's position in this case is very, very simple. And it's that regardless of how this court deals with the issues that have been raised by Mr. Stewart and by the prosecutors, specifically whether the objection should be reinstated, whether the contemporary one was incorrect, or whether the attorney's fees were too high, regardless of how this court addresses those issues, it should affirm the final approval of this settlement. In the briefs that were submitted on behalf of the objection, they did not challenge the fairness, reasonableness, or adequacy of the settlement itself. They have strictly challenged the attorney's fees. In Mr. Stewart's reply brief to this court, he actually stated he is not asking this court to second-guess the circuit court's approval of the settlement. With that statement and with no arguments attacking the reasonableness of the settlement, that issue has been waived under Rule 341H7. The contempt and the fees appeal do not impact the settlement. They did appeal the final judgment in order to dismiss it with prejudice, correct? Correct. So having appealed that, we can look at that, even if the judge has an independent fiduciary relationship with the absent class members. Correct. So we could look at the settlement itself, even if the judge should look at the settlement itself, irrespective of whether there's an objection or not. Correct, Your Honor. On behalf of the class. Absolutely, Your Honor. And the court below obviously did that. The court... Well, how do you know it's obvious? Is there a record... In the record, is there a transcript of the preliminary approval hearing? Yes, there is. There is? I'm sorry. I misunderstood you. There is there? Not for the preliminary approval. There is for the final approval. Right. So we have no idea what happened at the preliminary approval hearing. We don't know what occurred. And this case has a peculiar twist. That is, it was a packaged appeal. Correct. It was mostly litigated in New Jersey, and it wasn't much litigation. In the record is the package sheet. It doesn't show much activity. There was not much activity in court, Your Honor. There was a considerable amount of activity between myself and counsel for the plaintiffs, including two mediations before a retired federal judge, additional settlement communications, and considerable what we'll call informal discovery. But considering that before Judge Kennedy, a complaint was filed, it was explained why it was filed now in Illinois, and the next thing we know, preliminary approval papers and a hearing, which we don't know what happened, and everything is approved. So preliminary approval. Preliminary approval. The fact that we don't have any idea, I mean, to me this is not your typical case. Usually if we were in New Jersey, it would be different, but having come here and without her having any idea, based on what I can see in the record of what happened, I mean, how did Judge Kennedy know that this is a fair, reasonable settlement? Your Honor, I'll respectfully disagree that the judge didn't know what happened in New Jersey. There were very detailed briefs that were submitted that explained exactly what happened. But most of that activity, as you just referred to, occurred even outside the New Jersey court. It was all a mediation, whether it was conducted here or in New Jersey. Very little activity. I mean, the judge in New Jersey would not have known the extent of the parties' work on the case, right? Not exactly, Your Honor. We did appear before the magistrate judge. We were very transparent with the judge exactly what we were doing. The judge was happy to hear that we were cooperatively working together. In fact, before we transferred the case, before we dismissed the case in New Jersey and moved the case here, we, again, to be transparent, called the court, had a phone call with the judge and explained exactly what was happening, what had transpired, that there had been multiple violations. Yes, Your Honor. Your Honor, we presented all of the information that was relevant to doing the analysis. If the judge had any further questions, we would have, of course, provided that information. Notice was sent out to the class. The notice in this case was extraordinary. Over 99% of the class members received direct notice. And, Your Honor, it's important to note also that we're not working on a blank slate here. There is an established marketplace of settlements under the Telephone Consumer Protection Act. All of that information was presented to Judge Kennedy below, and this settlement is extremely favorable on the numbers. You look at the number of class members. You look at the dollar value going. Again, the attorney's fees is a separate issue. My client is interested only in seeing the settlement affirmed. There were substantial defenses that my client had to both class certification and the merits of the case. There were, frankly, serious issues that could have prevented this class from recovering anything because many of the phone calls at issue were placed by a third-party marketing company. My client's position was we were not vicariously liable for that company's activity. That company is effectively judgment-proof. They are contributing $0 to this settlement. This, as always, happens. That's a very real risk, Your Honor, that we could have litigated this case for another 10 years, and the class could have recovered absolutely nothing. And so this is a very strong settlement. Judge Myerson looked at it. My apologies. Judge Kennedy looked at it. Yes, there was a preliminary approval. There was not a hearing. That's not atypical, Your Honor, because typically the court waits and sees what is the reaction of the class. That's one of the factors. That's one of the Korshak factors is the court needs to look at the reaction of the class. Are there objections? Typically, that gets handled at final approval, which is exactly what happened here. The court looked at those factors, made very detailed findings. The standards are reviewed here, Your Honor, even if you were to look at it, even though the objector himself has abandoned that issue. It's an abuse of discretion standard, very high standard. We're here, Your Honor, because they appealed, to your point, from a joint order that awarded both the fees and approved the settlement. There is authority providing that this court can, even if you change the fees, even if you send it back down, you can affirm the final approval of the settlement. That is what my client respectfully requests that you do. We are interested in putting this case behind us. We are interested in paying the money into the settlement fund so it can be distributed to the class, and my client wants to move on with its business. Unless the court has any further questions, thank you very much. Thank you, Mr. Fedor. You're kind enough to talk in this way, too. Yes, Your Honor. Thank you very much. All right, now Mr. Diaz. Good morning, and please, the court. I'd like to start, as the court did before, with the threshold matter of the content order. And I think what Mr. Thott said previously is very illuminating. He said that Mr. Stewart decided he was not going to appear. You can't just decide you're not going to follow a court order. The Illinois Supreme Court has been very clear about this. Was he subpoenaed to be there? I'm sorry? Was he subpoenaed to be present? He received a Rule 237 notice. But he wasn't a party at that point. And then the court entered a written order saying that he had to appear to testify at a time, at a date. But that's not the way you get a non-party in a case. The way you get a non-party in a case is by subpoena. That's the only way to get a non-party in court. That is true. You don't just issue an order saying I want everybody on 79th Street to show up in court today. That's not the way it works. That is true, but in this case he is a party. He appeared through counsel. He filed an objection. He availed himself of the Illinois court system at great length. And the subject of the hearing was directly related to the paper that he filed in court. So I understand that, you know, the word party is a little bit vague. The objection had already been overruled, correct? The objection had been overruled, yes. So he had no other issue in the case other than that he was a class member? No, that's not true. He had, in fact, already attempted to file a notice of appeal, which he then had to withdraw because the sanctions motion was filed. But he was still involved in the case. Well, you wanted him present, correct? Of the hearing? Yes, we wanted him present. Well, you should have subpoenaed him. If we had subpoenaed him, we would have had to do it through California. They would have fought it in state court in California. We didn't believe that was necessary, neither did Judge Meyerson. But regardless of whether Judge Meyerson was correct, this isn't a question of the jurisdiction of the court. It's a question of ‑‑ it may be a question of interpretation of Rule 237, but Mr. Stewart is not allowed to simply disagree with what the circuit court thinks Rule 237 says and decide to disobey a court order. He has to show up. But you believe that he should have been held in direct criminal contempt. Is that what you're telling this court now? That's what I'm telling this court now, that's correct. Do you realize what direct criminal contempt means? Yes, it means ‑‑ The only way that I can hold you in direct criminal contempt is that it has to happen either in my courtroom or in my chambers. If it happens in the hallway, if it happens on State Street, if I tell you don't punch him again and you punch him again, that's not direct criminal contempt. That's correct. Everything that happens has to be in the courtroom within the hearing of the judge. So at the very least, he was entitled to a hearing. To determine whether or not he ‑‑ there should have been a room to show cause, a petition filed, to hold him in contempt, and then the court should have had a hearing and then moved the court in. It's not a direct criminal contempt because he didn't show up. Respectfully, I disagree with you, Your Honor. In Levington, this court held that ‑‑ Can you finish? Sorry? I'll let you finish. In Levington, this court held that when an attorney makes clear on behalf of a client in court that they are willfully deciding not to follow a court order. That did not get you to direct criminal contempt. This court did, in fact, hold other witnesses. No, the court was wrong. That's fair, Your Honor. Sometimes we disagree with each other. Let me ask you the question I asked. He did not appeal the July 24th order. It does not appear that he did, Your Honor. Right. So what's your position? I don't think this court has jurisdiction in having not appealed the order of contempt. So everything you just spoke about is irrelevant for purposes ‑‑ And not only is it irrelevant, the rest of his appeal, the court then also, he does not have standing to appeal the rest of it because his objection has been stricken. He has nothing on the record. He didn't appeal the order that struck the document from the record, meaning that he's not properly before the court today at all. Although he had tried to appeal while he was ‑‑ before he was stricken. And because of the 137 hearing, he had to wait. Yes, because he withdrew that appeal. Right. Because it was premature. And I believe this court also entered an order of distrust in it. Right. So I don't think, you know, that appeal is not ‑‑ you know, if he had left that notice of appeal on the record, then perhaps. Although, again, his objection was stricken. So, you know, the only basis for him to be in this court and to have a right to appeal is his participation as an objector. And that participation is now gone because the circuit court struck the objection as a sanction. As a sanction. That's correct. Which was after the fact. I mean, the fact is that when he ‑‑ with regard to the objection on the settlement, at the time that he lodged that, it hadn't been stricken. It was only subsequent, months later, after November, that it was stricken. Sure, that's how any ‑‑ that's how stricken anything was. The defendant's answer can be stricken after, you know, after they went on some claims. That's totally possible, too. It's the same principle. Or a plaintiff can, you know, can beat a summary judgment motion and then have certain claims stricken as a sanction. There's not really any difference. With respect to ‑‑ so as far as that is concerned, I don't believe that Mr. Stewart has a right to be here today. And that really should end this case. With respect to the merits of Mr. Stewart's appeal, the question of attorney's fees and also about the settlement, as the court was discussing earlier, with respect to the settlement, you know, we did explain to both Judge Kennedy and to the New Jersey court why we brought this case to Cook County at the time there was ‑‑ Spokao, which you said called into question federal jurisdiction, didn't really have anything to do with jurisdiction. And TCPA is a federal statute. A federal court has jurisdiction over it. It talked about injury in fact. And Spokao posed a risk to your case because perhaps the U.S. Supreme Court was going to say unlike unsolicited taxes, an unsolicited phone call doesn't result in injury in fact, even though that was a credit reporting case. So now you come to Cook County where, I guess, maybe judges don't care about injury in fact, and you present Judge Kennedy with, as Justice Hyman referred to it, a package deal and said we were in New Jersey for a while. We decided to come here. We all agree Gannett is going to pay or its insurers are going to pay 13 plus million dollars. The class is going to file claims. And we're going to seek up to 39% of that fund as our attorney fee. What obligation did Judge Kennedy have at that point to absent class members? Judge Kennedy had the obligation as a fiduciary to absent class members to ensure that the settlement was fair and reasonable and adequate. She absolutely did so. And so when you asked for 39% of the settlement fund, 5 million plus in fees, what did she have before her to say that that was a reasonable fee other than your say so? She had a detailed briefing on the matter including other cases, so comparisons to other cases and the recovery both on the whole. Well, in the sentence down the hall where you said he gave us 40%, so we're being more reasonable, in this case 39%. What else did she have? A number of other cases that had, you know, that had a variety of different fees, many of which had significantly worse relief than in this case. So cases where people were getting less money. The amount of relief for class members is driven by the number of class members who file claims, right? So in this case, if your 2.5 million class members had cared enough to file a claim, they would have gotten pennies, right? You know, courts have routinely declined to look at the illusory contents of the entire class filing. It never happens. We try as hard as we can. It happens usually, and everybody knows this, that something around 1% or less of these consumer classes care enough to file a claim. We try the best we can. In this case, we had over 2%, which we got notice to 99% of the class, but at the end of the day, you don't want to be calling these people and hounding them to file claims in a lot of money. Right? And so there's only so much you can do to bug people to get them to fill out the forms. And look, we want people to get their money, the money that is due and owing. Even if the claims had been double or triple here, the relief still would have been outstanding, far above the $30. I'll give you that. They're getting $175 when in most cases you say they might get $25 and a $500 claim. So I'll give you that. But the five-plus million dollars that the Plaintiff's Class Council is seeking directly detracts from the amount of money that class members are recovering. So if you said to somebody, you're entitled to $175, or you might be entitled to $225 if we took $3 million in fees. So what information did the trial court have to allow her to make that evaluation on behalf of the absent class members, whether this was a good deal for them? It's all the factors that this court and the Illinois Supreme Court have set up, whether it's the previous fee arraignments, but as far as the class is concerned, yes, the amount of money, the amount of money per class member, and the high risk of this case in particular. That's high risk. Apparently you've been very successful settling these cases, and counsel just mentioned these cases could be link-free, and there appears to be a lot of settlements around. You have a whole list of cases with settlements. So this is an agency case. The Net didn't make the call themselves. I personally lost two of those cases. One of them was notified by a class member. At least one of them is on the record. So one is on the record. Is that on the record for the preliminary approval? We certainly discussed in the preliminary approval motion the risk of bringing in agency cases and instances in which agency cases have failed. The problem with the preliminary approval, we don't have the transcript. It's making it very difficult for us to know what happened. I mean, the fact that you filed, see, that happens all the time. We have pleadings in cases, but we don't have the transcript. And the fact that, in most cases, the trial judge knows what transpired. In this case, nothing transpired before the trial judge. I think that even in cases where there's litigation in front of the trial judge, maybe a motion to dismiss, you know, most of the summary, most of the work at settlement comes at the parties' framed evaluations of how good the prints are. And that really usually happens at final approval as opposed to a preliminary approval. But because of the nature, we don't have the facts in this case. It's unique because of the package. So if it was going to be settled and you were looking for a jurisdiction, for whatever reason, you picked, you obtained Clark and you came here. But the judge had no background at all on this particular matter and what went into it. And it's concerning that there's no request by the court that promotes that information when the judge is unaware of what transpired previously because much of it was not litigation. You said it was off. It was informal. The Illinois Supreme Court has been very clear on this matter that mode star, that circuit courts have an option to pick mode star or to pick a percentage of it. But the question is whether that action is different in a situation where the court is familiar with the case or unfamiliar with the case. And it might be that if the court is unfamiliar with the case, doesn't the court need some more information, particularly when 39% is on the high side of percentages? Do you agree? It is certain. I think it is reasonable. Well, I don't think it's reasonable. It is on, for a consumer cross-action case, it is on the higher side. Okay. Contingency fees. It's on the high side. Case didn't go to trial. It did not. A lot of complexities. These cases are actually quite complicated. That's not what the courts have said. Especially when there is the sort of layers of agency. Usually there are some layers of agency. We've had other cases here. I think when you look at the whole thing, the question is, under this case, where it came to the court as a done deal, just looking at the percentage is enough. And whether that passes muster for the action class. I would respectfully disagree with the idea that the circuit court looked at just the percentage. Judge Kennedy looked at, as I said, the detailed information that we provided her. The detailed information being? Regarding the risks of this case, regarding the jurisdictional problems in the federal court, possibly even in the state court, regarding agency problems, other similar settlements, the amount of money that we were getting for folks. All of this information was provided to the circuit court. That's the same kind of information that judges in any case use to evaluate a settlement. You've never been reluctant to provide your lodestar information, right? If we'd been asked, we certainly would have been provided, but we know it is not required, so we didn't. Did you tell the court that you were willing to provide the information? I don't believe the court ever asked for it. No, that's not my question. My question is, though, given the short time that Judge Kennedy had jurisdictional in this case, and it is clear, you're correct, that Judge Kennedy had a choice to either use the percentage method or the lodestar method, but based upon the knowledge that she had about the case, isn't it an abuse of discretion to not use the lodestar method? I don't think so. The Supreme Court has never suggested that the judge's personal knowledge of a case has anything to do with that calculus. It is a matter of what's going to be the fairest way to apply the common fund doctrine. The percentage has been 75 percent. That would be absurd. Nobody should get 75 percent. Let's see what the continuum is. What if it had been 60 percent? That's still absurd, right? 50 percent is not. 50 percent is probably absurd. No, it's probably absurd, right? 50 percent is probably absurd as well. I disagree with you on this. I disagree again. This court looks at whether the fee is reasonable and customary in this state, and this court has a number of times said that a 40 percent continuity fee is not out of the ordinary, even higher than that. You can't say that without context. Everything in the law has some kind of context, and so when you say that without knowing what went on in those cases, how many years, whether there was a trial, how many depositions, how many motions, how much discovery, those cases were, many of them were private clients. Most of them were private contingency fees. Which is totally different. These are people who have no conventional duty, like you have in a class answer for the judge in those cases. But these are people who agree ahead of time to pay this fee when they personally have a lot at stake in the case. That's right. And that's something that the Seventh Circuit looks at very carefully, in fact, in this type of case. They say, well, look, arrangements between a class representative and class counsel, you can't look at that because they're not in it. But when you've got people who are really invested in a case, like some of the cases that have been, that this court has looked at, and those cases say that people who really have significant stakes in their case are agreeing to 40, 50 percent. The thing is, it's difficult. It's totally, it's apples and oranges. I mean, if you're talking about class actions and class action fees, that's one thing. If you're talking about contingency fees and personal injury fees, that's another animal. Totally different animals. And for you to, at least in Illinois, they're different animals. So if they're a different animal, you need to look at what happened in each of those cases. And if you look at what happened here, it really appears in a matter of a few weeks after filing that the settlement was presented. We don't know what happened at the hearing. The file took a few months later. And the court never seems to, as far as we know, the court didn't change one word of the preliminary approval order, did she? I don't know. Are you aware that she changed anything? I'm not aware that she changed anything. Okay, so it was, as far as I could see, it looked like it was the revenue supply. She just signed off on it, correct? I would not have figured. Okay, so I don't know. But if we compare what went out that we had, well, if you catch what went out, it was in the settlement agreement. So are you aware of any changes? I'm not aware of any changes. Okay, so she signed off on an agreement. I mean, no changes. And we don't know what happened at the hearing. And you never mentioned that you were willing to give her the most information. But Mr. Stewart did come in and demand that we produce the most information. I'm talking to someone there. At the preliminary agreement, we had not yet asked for attorney's fees. Yes, you did. You had a percentage. We had a percentage up to which we could request, but we had not yet filed a motion requesting attorney's fees. 39% is a lot. And whether she's going to send that out, courts have said, well, I'm not going to let you send out 39%. That seems a little high. Nobody said anything here. I'm not aware of any such cases. Generally, at preliminary approval. Just put in there whatever the counsel wished. At preliminary? Have you ever heard before Judge Shader? I have not heard before Judge Shader. But, yeah. I understand. Finally, with respect to our cross-appeal. So, there was a hearing with respect to whether Mr. Scott should be sanctioned for his conduct in this litigation. At that hearing, our ability to present evidence was severely limited. When we took up counsel filed a motion to eliminate, the morning of the hearing, citing a Seventh Circuit case that they argued stood for the proposition that you could never look at anybody's previous dealings as an objector unless they had been determined to be frivolous. Right. And that's not what that case says. So, Judge Meyerson, in that instance, made an error of law, which is an abuse of discretion. That case said, when that is the only information you have, when all you have is that they've previously represented objectors, that can't stand as the basis of sanctions. But it does not stand for the proposition that you can't use that evidence, along with evidence of what happened in a given case, to prove that someone acted with an improper motive. And in this case, we had numerous times that Mr. Scott had worked with Mr. Bandus, that we were ready to present those exhibits or in the record. They're not admitted into evidence because we were not able to present them. But ultimately, the reason that Mr. Scott was not sanctioned is because we weren't able to prove that he acted with improper motives. Well, what does it mean to be local counsel? His appearance went out of interest. In his – I think his appearance was his local counsel. Local counsel is when you are the local affiliate for someone who has appeared pro obfite. Mr. Scott's not local counsel. No, he doesn't – excuse me. He did not say in the appearance that he's local counsel. So he appeared for all purposes. He appeared for all purposes. He said a few times that he's just local counsel, but that's not true. He's sole counsel. Is he sole counsel? Yes. Mr. Bandus is not licensed to practice law in this state. I understand, but wasn't he counsel? He was counsel. He said he was counsel, which means he's engaged in the unauthorized practice of law, which is the second part of our cross-appeal. You can't represent somebody in a court of this state without authorization from the Illinois Supreme Court. And Mr. Bandus did, in fact, do so. He participated in a mediation. He participated in a mediation. He drafted all the papers. The mediation. Who was that before? His name is Rodney Max. He's a mediator based out of – I think he's in Florida and Alabama. Where did the mediation take place? It was on the phone. It was on the phone. Yes. So Mr. Bandus is in California. Mr. Bandus is in Texas. Okay. So Mr. Bandus is in Texas. His client is in Florida. You're here. The mediator is in Florida. The mediation was conducted by Mr. Valvanian, who is a member of the Illinois Bar, but he does live in California. Okay. But it's for a case in the courts of this state. So, I'm sorry, you said it was Rodney Max? M-A-X. M-A-X. Yes. So, Mr. Max, evidently, following the mediation, tells Mr. Valvanian something that Mr. Bandus said to him in the mediation that wasn't shared with finance counsel, right? Mr. Valvanian's class counsel. Okay. I'm sorry. He tells Mr. Valvanian something that Mr. Bandus said to the mediator in a session that Mr. Valvanian wasn't present for. That's correct. Mr. Max is acting as the go-to speaker. How does a mediator do that? How does a mediator who, you know, you start out every mediation telling the parties that this is a confidential process, that I will meet with you separately, and unless you tell me to, I will not disclose to the other side what is said between you and me in a mediation? I assume that Mr. Bandus told him to say that. That's how it was presented. It was presented as, here's the offer Mr. Bandus is making. Okay. So, I don't think it was a breach of mediation confidence. And that's why we're able to get it into evidence, right? Because Mr. Max is acting as Mr. Bandus' agent to forward on the communication to Mr. Valvanian. Mr. Valvanian and Mr. Bandus, I don't believe are on speaking terms directly. We're at a place where Mr. Fott said that his local counsel was in his objection of Gary Stewart. Yes. He specifically said local counsel. According to the record, he didn't prepare any of the materials on behalf of Stewart. Is that correct? I don't… He prepared… I don't believe he prepared any of the materials. He said in his testimony that he had reviewed them and I don't know if that's true or not. But he didn't prepare anything.  All he did was prepare Mr. Bandus. Mr. Bandus' office. It was either Mr. Bandus or his associate. Neither from my licensed practice in Illinois. I didn't see his associate's name come up. I know. I think Mr. Fott testified that someone in Mr. Bandus' office prepared it. He only has three people in his office and two of them work on this kind of thing. And finally, with respect to Mr. Bandus, we moved for sanctions for the unauthorized practice of law. As Justice Hyman pointed out, he is practicing law in this case. Is he practicing law when the mediation is on the phone and he's in Texas? Yes. When you're attempting to settle a case out of a court of this state, you are practicing law. Well, that case is a state arbitration. It's not practicing law in a state. That is true. This is not an arbitration. This is a mediation of an actual case in court for which he could have sought pro hoc vici admission. In Illinois, you don't even have to move. You just file a 707 statement, but he didn't do that. He didn't pay a fee. He didn't pay a fee because he doesn't want to be subject to the jurisdiction of the court. In fact, he fought jurisdiction. The only way he got jurisdiction over him was by serving him personally while he was in Illinois. Mr. Bandus. Mr. Bandus. Yes. And so the circuit court said that it was a matter for the ARDC to look for an unauthorized practice of law. Actually, the ARDC didn't get that right to prosecute out-of-state attorneys for unauthorized practice of law until just a few years ago. Historically, it has been handled by the circuit courts. That's under the Illinois Attorney Act. Is it your position that Mr. Sutt was employed by Bandus and that he paid him an hourly? Certainly. I don't know. $25,000, I don't know how much. It certainly sounds like it. It's hard. I don't know what their arrangement is. We don't know of any arrangement, is there? Yes. He testified there was no written arrangement. He testified there was no written arrangement. Actually, because that's in violation of Illinois ethical rules, we reported that to the ARDC. And I believe after that, a written arrangement was made. That's what we heard from the ARDC in that event. Unless the court has any other questions, I can take my seat. Thank you. Thank you. Good morning, Your Honor. My name is Gerard Banks. I work in the Federal Court of Appeal under Mr. Bandus. My comments will be short. The Ellison firm brought a motion that included my client, Mr. Bandus, under Rule 137. They sought in that motion to have Mr. Bandus sanctioned. They also sought to enforce what they believed was a settlement agreement. That's all they brought before the circuit court. Judge Meyerson considered Rule 137. I won't recite it to you. You know it well. It's very specifically focused on whether an attorney signed a pleading that can be sanctionable for the reasons I've articulated there. That's a simple matter. That's a simple matter. I agree. So let's talk about the unauthorized practice of law. A court has authority, I think, to consider that. It might, although that is not a claim that was brought by the Ellison firm in the court below and only raised for the first time on appeal here, so we believe that they waived that argument. Certainly, that was not discussed at all at the 137. There was a straight comment, as I think we've described it in our papers, by Judge Meyerson, not by the Ellison firm. And certainly there was no clear notice to Mr. Bandus that he was being charged by the Ellison firm with a violation of the Illinois Attorney Act. And so to raise it now, and really to raise it because the Rule 137 argument is invalid. We know what Rule 137 said and we know what Meyerson said. Go ahead. They forfeited by not raising it. That's correct. The 137 argument by precedent isn't applicable to Mr. Bandus. I would agree with that, Your Honor. What's the matter? Nothing. Except to affirm Judge Meyerson's conclusion that Mr. Bandus is not subject to Rule 137 and not to overrule that decision. Anything else for Mr. Van Pemberton? No, Your Honor. Thank you. Thank you. All right, Mr. Fioli. Thank you, Your Honor. Please report, counsel. I represented Mr. Fett in the 137 proceeding, and Mr. Fett was in a pretty unique position. Mr. Fett did sign the objection in this case. Mr. Fett did stand by that objection and state that it was factually and legally sufficient. Then Mr. Fett endured a full day hearing regarding his motives for filing that objection. And after that hearing, it was judged by Judge Meyerson that Mr. Fett did not file it for an improper purpose and that it was legally and factually sufficient. So let's talk about the other cases, the motion in limine. So let's say, just assuming without deciding, that Mr. Fett and Mr. Bandus do this all over the country. They find an objector. Maybe it's always Mr. Stewart. And they go in and they file what is a facially meritorious objection, maybe just challenging the fees, saying the fees are too high. And then every time they say, you know what, we'll go away if you just give us part of your fees. So class counsel forks over a couple hundred thousand dollars. Mr. Bandus and Mr. Fett are happy. The objection is withdrawn and the settlement is approved. How would evidence of that pattern of conduct in other cases not be relevant to the determination of whether the objection was filed for an improper purpose? Not that it lacks merit, not that it's frivolous, but it's filed for an improper purpose. A couple of responses to that, Judge. First of all, that's not the record in this case. If you look at the cases that they cite where Mr. Bandus' conduct is recommended by the court, and by the way, there's never a judge frivolous, but those cases do not balance the site. And if you see in the record, Mr. Fett testified to it at the sanctions hearing. There were four or five other cases where Mr. Fett represented an objector. None of them follow this pattern that they're talking about where you file the objection, it gets overruled, then you take it up on appeal, and then you try to get some type of a settlement. Mr. Fett testified that happened in none of the cases where he represented an objector. So for that reason, it's irrelevant in this case. But also, you have to look at Bowmer v. Selden, which is the case that we premised our motion and limine upon. And counsel indicated that there was some type of a restriction in it where if that was the sole basis for trying to impose a sanction award, it was this prior conduct, that only in that instance should the prior conduct be excluded. And that's just not true. But to get to your point, Judge, what the court in Bowmer said was, in this case, counsel's past objections, which have never been adjudged frivolous, cannot form the proper basis of a sanctions award. So to take advantage of that. You're talking about a frivolous objection as opposed to an objection filed for improper purpose. You can have a facially meritorious objection. The fees are too high. And it can still be filed for an improper purpose under Rule 137. Well, I think if you file for an improper purpose, that is a frivolous objection. No, I think not. No, it doesn't. I think there's a theory on that point. Well, I agree with you. Not necessarily. It's possible. It's possible. But if you have an objection which was filed for an improper purpose, that is a frivolous objection. No, no. It can be facially meritorious. I'm filing the objection, you know, we assume in this case, not because I really believe the fees are too high, or maybe I do believe the fees are too high, but the only thing I want to get out of it is a cut of the fees for me. That's a facially meritorious objection filed for an improper purpose. And that's not what happened here, Judge. And we had a full-day hearing dealing with what the purpose was of Mr. Thurmond.  I think that by granting the motion limine, spelled doom for the sanction motion, because the whole concept behind Edelson Thurmond's motion was they're at it again, and they being the counsel in the case, which includes Mr. Vanders, whether he said he's general counsel, whether he has an appearance in file or not, he's working with Mr. Thurmond. And so to not allow all of that information in, and all those questions that the judge sustained objections on, created a whole different type of situation than what they were trying to prove. And all you need to do is read Judge Mellor's opinion in a related case, and I'm talking about the one from February 6, 2018, to note that with regard to this case, she thinks something's going on here. And maybe part of that fact that it was not noticed by Judges Kennedy or Judge Meyerson, was that how this case proceeded. Well, just a couple of points, and I want to go back. Mr. Thurmond, this is from that federal court case that you're referencing. And that doesn't matter. Because it doesn't matter. Because what the question was at the hearing had to do with the purpose. And the purpose is part of what – that's what we're talking about at this hearing, is the purpose. And so he's a part of that case. It doesn't matter if he's a part of that case. I don't care about that case. I do care about what the judge is saying about Mr. Vanders and how that relates to this case and what Mr. Thut knew about those prior acts and the fact that we have the mediator saying, basically, you know, you pay us off and we're done. I come back to the point again. What Judge Pallmeyer said relates to Mr. Vanders, not to Mr. Thut. It relates to a practice, and Mr. Vanders came to Mr. Thut, and Mr. Thut, you know, when you look at what he did or didn't do, you know, he's got to have his purpose. It might be influence, but what he knows about Mr. Vanders or didn't know. So, you know, you keep trying to say, well, Vanders took part in this particular case. That's not the issue before us. It seems though you're creating a rule that nobody can associate with Mr. Vanders and can never act as local counsel for Mr. Vanders just because of his reputation as being a so-called serial abductor. What if in the four or five other cases where they were associated, there was evidence that when Vanders got whatever he got as a concession from class counsel, he shared part of that with Mr. Thut. But that's not what happened, Judge. And the record is clear. Mr. Thut testified as to those cases. There was never a settlement. In fact, he appealed the previous cases where he represented the objector, and there was no settlement. So those cases, it doesn't follow those patterns of conduct that they're talking about. So it's completely irrelevant. And I also go back to Volmer v. Selden. If Volmer v. Selden sets the precedent that if it's a judge frivolous, then it's relevant. Well, if you can find another case where Mr. Thut or Mr. Vanders' improper purpose was demonstrated on the record and it judged to be improper, then it would be relevant. But unless you have that finding in a previous case where he filed the objection for an improper purpose in those cases, it's irrelevant under the logic of Volmer v. Selden. Well, first of all, that's a federal case. We don't have to follow it. Understood, Judge. So I don't think that it follows as to the irrelevancy when the information obtained at mediation and the conduct of Mr. Thut throughout this objection and Mr. Vanders in the way he conducted himself. Whatever it is, Mr. Thut signed the objection. So he's the one I'm going to vote. So then to limit the hearing as was done, it's going to not allow the evidence from to make the case that they were going to make. And they could never make it without bringing in all that evidence. This could have been the case of the first one, maybe. That's what you're saying. Maybe it is because there's a history here where, you know, there's a lot of information coming out there based upon what we've read in the record, in all the proceedings regarding Mr. Vanders. And Mr. Thut must have known about some of that stuff. I don't know, but that's what we're going to find out. And they couldn't ask questions about some of these other cases. Well, once again, Judge, you're getting into this guilt by association thing. Just because you associate with Mr. Vanders, you're automatically guilty. That's why we have a hearing. That's why we have a hearing. And we did have a hearing, Judge, and Mr. Thut testified at length. We didn't have this preliminary hearing. We had a hearing with one arm behind their back. I expect they disagreed with that because of the fact that they weren't able to introduce one case. Mr. Thut allegedly engaged in this practice with Mr. Vanders. And Mr. Thut, clearly on the record, testified that this practice never happened. They had a hand tied behind their back as a result of the motion to eliminate. Who knows what else they couldn't bring in. We really don't know. But at least they should have had that opportunity because these are very serious charges. And what Judge Palmer has said is very serious charges. And the other one who's responsible here, fortunately, is your client because he's the one who signed the document. And he stood up to those charges, Judge. And also, with respect to Judge Palmer, her opinion is just based on a complaint that they filed, a legal complaint. There's been no evidence taken in that case. All there was before was a 12B6 motion to dismiss. So there was no evidence presented before, unlike this case, where we did present a full day of evidence regarding the alleged improper purpose in filing the objection in this case. And after hearing all that evidence, Judge Myerson concluded that Mr. Thut acted properly. Well, it depends on whether the motion to eliminate had a negative effect on the hearing. Which is also an abuse of discretion standard. And under the precedent of Obella v. Feldman and the other cases that we cited, it certainly can't be deemed an abuse of discretion. Anything else for Mr. Field? All right. Thank you. Thank you. I have nothing further to add to this. If the panel has any questions. All right. Anything on the cross-appeal, Mr. Chiosky? Just a few very quick points. With respect to Mr. Bandit, that claim that we have somehow waived the unauthorized practice of law claim, it's on page 7 of our Rule 137 motion. I'm sorry, I don't have the record plate in front of me. But the Rule 137 motion is in the record. Our request for unauthorized practice sanctions are on page 7 of that motion. It is in the body of the text, not in a footnote or a straight comment. With respect to Mr. Pioli's comment- Was that ever discussed by the court? Yes, it's in the transcript also. He discussed it. But what you did is say that you should go to the ARDC. Yes, which we did. But that's not the only possible remedy. With respect to Mr. Pioli's comments, I think the way that he defended Mr. Feltz's conduct explains why the evidentiary exclusion wasn't proper. He got up here and said that while Mr. Feltz didn't actually- Well, that's not in the record. They objected every single time we attempted to say anything about any of those cases. There's nothing in the record that made it into evidence that stands for the proposition that Mr. Feltz never done this before. He has, and we can prove it. And finally, with respect to the federal opinion of Judge Pallmeyer, Judge Pallmeyer specifically noted in that February order that her conclusions were bolstered by her personal experience, the court's personal experience with Mr. Bandus, not just her allegations. Unless the court's got any other questions, that is all I have. All right. Thank you for your consideration. Thank you. Thank you all for your arguments and your briefs. You've given us a lot to think about, and we will take the case under advisement. The court will stand in recess, and we'll call the next case shortly.